1
2
3
4
5
6
7

8
# UNITED STATES DISTRICT COURT

9
## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11   UNITED STATES OF AMERICA, | Case No.  1:21-mj-00094-SAB-1 |
| 12            Plaintiff, | ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS |
| 13        v. | (ECF Nos. 26, 29, 31, 34) |
| 14   ABRAHAM AGUIRRE, | |
| 15            Defendant. | |

16

17    Currently before the Court is Defendant Abraham Aguirre's ("Defendant" or "Mr.

18  Aguirre") motion to suppress.  Having considered the moving, opposition, and reply papers, the

19  exhibits attached thereto, as well as the evidence and arguments presented at the hearing held on

20  July 20, 2023, the Court issues the following order.

21                                              **I.**

22                                      **BACKGROUND**

23  **A.      Procedural Background**

24    On September 14, 2021, Defendant was charged by criminal complaint with: (1) unsafe

25  operation, in violation 36 C.F.R. § 4..22(b)(3); (2) operating a motor vehicle while under the

26  influence of alcohol, in violation of 36 C.F.R. § 4.23(a)(1); and (3) operating a motor vehicle

27  with a blood alcohol content equal to or greater than .08 grams of alcohol per 100 milliliters of

28  blood, in violation of 36 C.F.R. § 4.23(a)(2).  (ECF No. 1.)

Defendant made an initial appearance on October 21, 2021, at which, Defendant plead not guilty.  (ECF No. 4.)  On January 20, 2022, the Court held a status conference, at which, Defendant requested a continuance, and the matter was set for a status conference on February 17, 2022.  (ECF No. 10.)  On February 17, 2022, April 28, 2022, June 16, 2022, September 15, 2022, November 17, 2022, and January 19, 2023, the Court held status conferences, and the Defendant was granted a continuance at each conference.  (ECF Nos. 14, 15, 16, 18, 19.)  On March 16, 2023, the Court held a change of plea or trial setting hearing, and the matter was set for trial to occur on May 19, 2023.  (ECF No. 22.)  On April 20, 2023, the trial was reset for June 23, 2023.  (ECF No. 24.)

On June 9, 2023, Defendant filed a motion to suppress evidence.  (Def.'s Mot. Suppress ("Mot."), ECF No. 26.)  On June 16, 2023, the Court entered a stipulated order vacating the trial date, and setting a briefing and hearing schedule on the motion to suppress.  (ECF No. 28.)  On June 30, 2023, the Government filed an opposition to the motion to suppress.  (Gov.'s Opp'n Def.'s Mot. Suppress ("Opp'n."), ECF No. 29.)  On July 10, 2023, Defendant filed a reply to the Government's opposition.  (Def.'s Reply Opp'n ("Reply"), ECF No. 31.)

On July 20, 2023, the Court conducted an evidentiary hearing, at which, Chan Hee Chu appeared on behalf of the Government, and Laura Myers appeared on behalf of the Defendant.  (ECF No. 34.)  The Court admitted the Government's Exhibits 1, 2, 3 and 4; and Defendant's Exhibits A, B, and C.  (Id.)

**B.    Factual Background**

The Court summarizes that facts as presented by Defendant and the Government in their respective briefing, as based on the reports from the involved officers, as well as the surveillance footage that the Court reviewed, including the specific portions of the video footage presented at the evidentiary hearing.  The parties essentially agree on the relevant facts as they occurred, or have no dispositive dispute over any specific proffered interpretation or event – except as noted below.  In that regard, the parties felt no need to have the Defendant, the rangers, or any other witnesses testify, and rested their arguments mainly on the portions of the video evidence that were most relevant to the legal arguments each side relied on.

On Friday, June 11, 2021, at around 2:09 p.m. PST, Rangers Roberto Cueva ("Cueva" or "Ranger Cueva") and Ryan Cloutier ("Cloutier" or "Ranger Cloutier") were on uniformed patrol in the boundaries of Sequoia National Park in the Eastern District of California (the "Park"). The rangers were notified by the park's emergency communication center of a vehicle stuck off of the road on Generals Highway in the Park.

Upon arrival on scene, the rangers found a maroon Toyota Tundra[1] stuck off of the paved road on the side of a hill, with two individuals standing nearby. The rangers spoke to Mr. Aguirre and his nephew for just under twenty minutes. Mr. Aguirre identified himself as the driver of the vehicle. Mr. Aguirre reported that while driving eastbound on Generals Highway in Sequoia National Park, he attempted to perform a U-turn on a pullout section of the road. Mr. Aguirre reported he went too far while driving in reverse, causing his truck to become stuck off the side of the road.

The vehicle smelled of alcohol, and the rangers saw in plain view, an open, empty bottle of Modelo beer in the rear passenger area of Aguirre's truck. Based on this and other evidence of impairment due to alcohol, Ranger Cloutier began an investigation of Mr. Aguirre to determine if he had been impaired while driving.

Before performing any tests, Ranger Cloutier spoke to Mr. Aguirre about the purpose of the investigation. (Gov. Ex. 1 at 2:20.) They had the following conversation:

> Ranger Cloutier: My main concern right now is that maybe you're not safe to drive just by the amount of alcohol you've had. So I'd like to perform a few tests just to make sure that's not the case. And if you are okay to drive, then we'll hopefully get you—
>
> Aguirre: I don't have to drive. Someone else can drive.
>
> RC: Yeah, okay. But you were driving, correct?
>
> AA: Yeah.
>
> RC: Okay. So if you're okay with me performing a few tests, then we can determine if you're safe to drive, and then we can work on getting your car out of here.

---

[1] The parties' briefing and one police report indicates the vehicle was a Toyota Tacoma (ECF No. 26-1 at 2), while another police report indicates the vehicle was a Toyota Tundra (ECF No. 26-1 at 13). The video appears to show that the vehicle was a Toyota Tundra.

AA: I don't have to drive.

RC: Right, but you were driving, so we're going to find out if you were safe to drive at that point.

AA: If I'm sober or not sober? That's what you want to know?

RC: Yes, correct.

(Id. at 2:20-2:58.)   Ranger Cloutier asked Mr. Aguirre if he would be willing to perform Standardized Field Sobriety Tests ("SFSTs"), to which Mr. Aguirre initially consented.  (Id. at 3:00–03 (Q: "So are you willing to perform those tests?" A: "Yeah.").)  Prior to administration of the SFSTs, Mr. Aguirre admitted to having had three to four beers, indicating that he had had the beers in Visalia, California.  (Id. at 1:45–2:00.)  Mr. Aguirre also answered "no sir" when asked if he was "under the care of a doctor for any reason at the moment" and if he had "any medical conditions currently underway."  (Id. at 3:45–50.)  Mr. Aguirre also indicated that this was not the first time he had performed SFSTs.  (Id. at 4:08–11.)

Ranger Cloutier began to perform the Horizontal Gaze Nystagmus test.  (Id. At 4:15.) Soon after Ranger Cloutier began administering SFSTs, Mr. Aguirre stopped performing the tests and refused to continue, stating that he was "okay."  (Id. at 4:34–40.)  Mr. Aguirre then confirmed that he would not perform the SFSTs by first answering "no" when asked by Ranger Cloutier if he was not going to perform the tests and also by shaking his head when asked again if he was not going to perform any tests.  (Id. at 4:42–48.)

Ranger Cloutier then stated: "you know that can be used against you in court, correct?" and Mr. Aguirre nodded his head and said "mm-hmm."  (Id. at 4:48-50.)

Ranger Cloutier asked "so you are not going to commit to do those tests," and Mr. Aguirre then stated he would be willing to take a "blood test" and other tests in lieu of the SFSTs.  (Id. at 4:52-58.)  In response, Ranger Cloutier stated that "we can get a warrant to do those things" or Mr. Aguirre could perform the SFSTs and he could "just go" if he passed the field sobriety tests.  (Id. at 4:59– 5:07.)

After further discussion, Mr. Aguirre again agreed to perform the SFSTs and later breathalyzer tests.  (Id. at 5:25–28 ("So you are willing to do them?" A: "I am willing to do

them."); <u>id.</u> at 11:30–32 (Q: "Would you be willing to do that for me right now?" A. "Yeah.").)

Despite the use of two different breathalyzers and multiple attempts, the breathalyzers failed to provide any viable reading. (<u>Id.</u> at 11:32–15:08.) Seconds prior to the last attempt to administer a breathalyzer test, Mr. Aguirre stated that if the test did not work to "take [him] to the hospital." (<u>Id.</u> at 14:39–42.) Ranger Cloutier further sought, without any success, breathalyzers from other officers. (<u>Id.</u> at 16:00–15.) Based on Mr. Aguirre's performance on the SFSTs and other observations, Ranger Cloutier arrested Mr. Aguirre for driving under the influence of alcohol. (<u>Id.</u> at 16:40–17:11.) After handcuffing Mr. Aguirre, Ranger Cloutier informed Mr. Aguirre of his <u>Miranda</u> rights. (<u>Id.</u> at 21:50–22:22.)

At around 3:08 p.m., Ranger Cloutier drove Mr. Aguirre to the Ash Mountain Ranger Office (the "Ranger Office") to prepare for transport to the Bob Wiley Detention Center in Visalia, California. At the Ranger Office, Ranger Cloutier, with the help of other rangers, attempted to apply a belly chain to Mr. Aguirre so as to make him more comfortable. (Gov. Ex. 1 at 42:40–52:00.) During this attempt, Mr. Aguirre informed the rangers for the first time that he was diabetic. (<u>Id.</u> at 47:30–33.) Mr. Aguirre, however, refused to answer whether he had taken his medication that day and to help the rangers find his medication. (<u>Id.</u> at 47:59–55:15.) Ultimately, given Mr. Aguirre's lack of cooperation in this regard, at 3:35 pm, Ranger Cloutier began driving to the detention center without administrating any diabetic medication to Mr. Aguirre. (<u>See</u> Gov. Ex. 2 at 1:20.)

On the drive to the detention facility, Mr. Aguirre confirmed his willingness to submit to a blood draw. Specifically, after the rangers briefly discussed a warrant for the blood draw, Ranger Cloutier asked Mr. Aguirre: "Are you still willing to do a blood draw when we get to the jail?" (<u>Id.</u> at 25:14–21.)[2] After Ranger Cloutier and Ranger Monica Morrison ("Ranger Morrison"), who was also in the vehicle, explained that the blood draw would be taken at the jail by a medical professional, Mr. Aguirre asked "Blood test?" (<u>Id.</u> at 25:22–31.) Ranger Cloutier then answered "Yeah," and again asked, "Are you willing to do that?", to which Mr. Aguirre

---

[2] Defendant emphasizes that at this point, rather than calling dispatch to ask about obtaining a warrant, Ranger Cloutier asked Mr. Aguirre if he was still willing to have his blood drawn at the jail.

responded "Blood test, yes."  (<u>Id.</u> at 25:32–25:36.)[3]   Ranger Morrison called ahead to have a phlebotomist meet them at the detention center to draw the blood.  (<u>Id.</u> at 24:20–30.)

About thirty-five minutes after that conversation, the rangers and Mr. Aguirre arrived at Bob Wiley Detention Center at around 4:31 pm.  (<u>Id.</u> at 58:28.)  Once inside, Mr. Aguirre's handcuffs were removed and Mr. Aguirre was seated in a chair while the rangers filled out necessary paperwork.  (<u>Id.</u> at 1:10:00.)[4]  While seated, the  nurse at the detention center analyzed Mr. Aguirre's medical history and condition, eventually concluding that Mr. Aguirre's blood sugar levels were too high for admittance to the facility.  (<u>Id.</u> at 1:10:00–1:14:00, 1:15:35–1:16:30.)  She told the rangers that his blood sugar was too high for him to be booked into the jail, and that they needed to take him to the emergency room.  (Gov. Ex. 3 at 1:34:10.)  At that point, the phlebotomist had not arrived.  The rangers considered their options and decided to transport Mr. Aguirre to the hospital rather than wait any longer.  (<u>Id.</u> at 1:38:20.)

The rangers handcuffed Mr. Aguirre to take him to the hospital after about twenty-five minutes at the detention center.  (Gov. Ex. 2 at 1:22:30.)  On the way out, Mr. Aguirre turned to Ranger Cloutier at the door and asked "Can I call my lawyer?"  (<u>Id.</u> at 1:22:39–40.)  Ranger Cloutier responded, "We can get to that.  First, we're going to get you to the hospital."  (<u>Id.</u> at 1:22:41–50.)  Mr. Aguirre then responded, "All right, I'll call my lawyer from there."  (<u>Id.</u> at 1:22:45–50.)

As they were leaving, the phlebotomist arrived, leading everyone to go back inside for a blood draw, or as Defendant describes, the rangers decided to take Mr. Aguirre back into the jail to do the blood draw before transporting him to the hospital..  (<u>Id.</u> at 1:22:55.)  While going

---

[3]  There was some dispute in briefing over this precise statement, however as discussed herein, Defendant does not appear to argue the difference is ultimately material, and further, essentially conceded at the hearing that it appears this is the correct interpretation of the statement.  The Court's review of the video confirms this is what Mr. Aguirre stated at that point in the video.

[4]  In briefing, the Government emphasizes that during his time at the facility, Mr. Aguirre was unhandcuffed, sat in a relaxed posture in his chair, smiled in parts, and had cordial conversations with the nurse and the rangers, particularly about the need for him to go the hospital and the wait for a phlebotomist.  (Gov. Ex. 3 at 1:32:45–1:38:00.)  At one point, Mr. Aguirre commented: "By the time you take me [to the hospital] there will be no alcohol in my system.  I didn't drink that much."  (<u>Id.</u> at 1:37:00–05.)  When Ranger Morrison replied "It might be," Mr. Aguirre replied "okay, try it."  (<u>Id.</u> at 1:37:05–11.)  Ranger Morrison also asked, to no avail, the detention center nurse if the facility had a breathalyzer.  (<u>Id.</u> at 1:34:30–50.)

1   inside, Ranger Cloutier again turned to Mr. Aguirre and asked, "Are you still willing to do a

2   blood draw?"  (Id. at 1:23:19–20.)  Mr. Aguirre then stated, "Can I have some water?"  (Id. at

3   1:23:20–21.)  Ranger Cloutier then responded, "I bet we can get you some water now," and then

4   asked again, "Are you still willing to do a blood draw?"  (Id. at 1:23:21–24.)  Mr. Aguirre then

5   stated "Yes," nodding his head.  (Id. at 1:23:24–25.)

6           Once inside, Mr. Aguirre was unhandcuffed again and seated in a chair.   The

7   phlebotomist, detention center nurse, and the rangers then discussed the possibility that the

8   rangers may have to wait hours at the hospital they were going to.  (Id. at 1:23:30–50. )  While

9   seated, Mr. Aguirre asked everyone around for water.  (Id. at 1:40:31–33.)  Ranger Cloutier

10  responded by asking the detention center nurse if she had a bottle of water.  (Id. at 1:40:34–35.)

11  Seconds later, after Mr. Aguirre stated that he had not had water for three hours, the

12  phlebotomist replied "that's not our fault" and asked Mr. Aguirre to "relax."  (Id. at 1:40:35–41.)

13  Mr. Aguirre responded with "Oh yea, that's not your fault" in a questioning tone and then stated

14  that he would relax.  (Id. at 1:40:41–44.)  Ranger Morrison then stated, "We'll have the test first,

15  and then get you a bottle of water."  (Id. at 1:40:43–46.)  In response to Ranger Morrison, Mr.

16  Aguirre nodded and stated "all right."  (Id. at 1:40:45–46.)   The phlebotomist then stated

17  "cooperate and you'll get some water."  (Id. at 1:40:46–47.)  Shortly thereafter, the phlebotomist

18  took the blood draw and gave Mr. Aguirre water.  (Gov. Ex. 2 at 1:25:16–1:27:00.)  Mr. Aguirre

19  then engaged in friendly conversation with the detention center nurse, at times laughing and

20  smiling.  (Gov. Ex. 3 at 1:43:10–1:45:40.)

21          Shortly after the blood draw, at around 5:08 p.m., Rangers Cloutier and Morrison

22  transported Mr. Aguirre to Kaweah Delta Hospital, arriving at around 5:25 pm.  (Mot., Ex. 2 at

23  8.)  During the ride, Ranger Morrison read him California's informed consent notice regarding

24  blood draws.  (Gov. Ex. 3 at 1:53:00).  Ranger Morrison explained to Mr. Aguirre that he had

25  already had his blood drawn, but she was "legally required to read [him] [his] rights in relevance

26  to a blood test."  (Id.)  At the hospital, the attending nurse explained that Mr. Aguirre needed to

27  remain at the hospital for approximately five hours for treatment for his high blood sugar.  (Mot.,

28  Ex. 3 at 13.)  The rangers stayed with Mr. Aguirre for an hour and twenty-four minutes before

1  discharging him to the hospital.  (Id.)

2  **II.**

3  **GENERAL LEGAL STANDARDS**

4      The Fourth Amendment provides that "[t]he right of the people to be secure in their

5  persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

6  violated." U.S. Const. amend. IV.  "The Fourth Amendment does not proscribe all state-initiated

7  searches and seizures; it merely proscribes those which are unreasonable."  Morgan v. United

8  States, 323 F.3d 776, 781 (9th Cir. 2003) (quoting Florida. v. Jimeno, 500 U.S. 248, 250 (1991)).

9  Generally, "searches conducted outside the judicial process, without prior approval by judge or

10  magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few

11  specifically established and well-delineated exceptions."  Arizona v. Gant, 556 U.S. 332, 338

12  (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).

13      The Supreme Court has sustained the long-standing rule that "evidence seized during an

14  unlawful search could not constitute proof against the victim of the search."  Wong Sun v.

15  United States, 371 U.S. 471, 484 (1963).  This exclusionary rule is the principal remedy to deter

16  violations of the Fourth Amendment and encompasses both the "primary evidence obtained as a

17  direct result of an illegal search or seizure" and "evidence later discovered and found to be

18  derivative of an illegality."  Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Segura v.

19  United States, 468 U.S. 796, 804 (1984)).

20      The Supreme Court created the exclusionary rule as a sanction to bar the prosecution

21  from introducing evidence that was obtained by way of a Fourth Amendment violation.  U.S. v.

22  Phillips, 9 F.Supp.3d 1130, 1133 (E.D. Cal. 2014).  The exclusionary rule is a "prudential"

23  doctrine that is not a personal constitutional right nor is it designed to redress the injury from an

24  unconstitutional search.  Davis v. United States, 564 U.S. 229, 236 (2011).  Rather, the sole

25  purpose of the exclusionary rule is to deter future Fourth Amendment violations.  Id. at 236-37.

26  The exclusionary rule takes a "costly toll upon truth-seeking and law enforcement objectives"

27  and is only applied "where its deterrence benefits outweigh its substantial societal costs."

28  Hudson v. Michigan, 547 U.S. 586, 591 (2006) (internal quotations and citations omitted).

1    "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth

2    Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting

3    costs." Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. 135, 143 (2009)).

4        "Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the

5    district court," and "[a]n evidentiary hearing on a motion to suppress ordinarily is required if the

6    moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court

7    to conclude that contested issues of fact going to the validity of the search are in issue." United

8    States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986) (citations omitted).

9                                      **III.**

10                          **DISCUSSION & ANALYSIS**

11        In briefing, the Defendant first argues there were no exigent circumstances justifying a

12    warrantless blood draw, and presents arguments concerning lack of consent secondarily.  The

13    Government primarily argues there was valid consent, and secondarily presents arguments

14    regarding exigent circumstances.  The Court  finds there was valid consent to the blood draw for

15    the reasons explained below, and finds it unnecessary to therefore address whether there

16    additionally exigent circumstances that justified the blood draw test.

17    **A.    The Court Finds Defendant gave Voluntary, Unequivocal and Specific**
18    **       Consent for a Blood Draw Test**

19        1.    General Legal Standards

20        A warrantless search may occur when an individual gives consent that is "voluntary,

21    unequivocal, and specific."   United States v. Taylor, 60 F.4th 1233, 1243 (9th Cir. 2023)

22    (cleaned up).  Voluntariness of consent is analyzed based on "the totality of the circumstances."

23    Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d

24    854 (1973)).  Ninth Circuit precedent has focused the voluntary analysis on five non-dispositive

25    and non-exclusive factors: "(1) whether defendant was in custody; (2) whether the arresting

26    officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the

27    defendant was notified that [he] had a right not to consent; and (5) whether the defendant had

28    been told a search warrant could be obtained." Taylor, 60 F.4th at 1243 (quoting United States

1 v. Basher, 629 F.3d 1161 (9th Cir. 2011)).

2 "No one factor is determinative in the equation [and thus] [i]t is not necessary to check
3 off all five factors, but many of this court's decisions upholding consent as voluntary are
4 supported by at least several of the factors." United States v. Patayan Soriano, 361 F.3d 494,
5 502-503 (9th Cir. 2004) ("[T]hese factors are guideposts to consider in assessing the
6 voluntariness of consent, not a checklist of requirements to be satisfied." (citations and quotation
7 marks omitted)).  Further, "[b]ecause each factual situation surrounding consent to a search is
8 unique, we may also take into account any other factors that we deem relevant." Liberal v.
9 Estrada, 632 F.3d 1064, 1082 (9th Cir. 2011).  "A defendant's consent is not voluntary 'if his
10 will has been overborne and his capacity for self-determination critically impaired.' " Taylor, 60
11 F.4th at 1243 (quoting Schneckloth, 412 U.S. at 225).

12      2.    The Defendant's Primary Arguments Concerning Consent

13 While acknowledging he had been read his Miranda rights and was not threatened by the
14 officers' weapons, Defendant argues the remaining factors weigh against voluntariness, and thus
15 the totality of the circumstances show any consent was not voluntary.  Specifically, Defendant
16 highlights that when he first brought up the idea of a blood draw—nearly three hours before one
17 occurred—Ranger Cloutier responded by saying he could get a warrant for a blood draw, if Mr.
18 Aguirre chose not to participate in the roadside tests.  Defendant proffers that that point,
19 understanding that he was under investigation, he opted for the roadside tests.  Defendant
20 emphasizes that in the car two hours later, Ranger Cloutier asked him if he consented to a blood
21 draw at the jail but, Ranger Cloutier did not clarify his earlier statement that the rangers could
22 obtain a warrant for the blood draw, and nor, as he did previously, did he offer Mr. Aguirre a
23 second option to the blood draw.  Thus, Defendant argues he did not know that he could refuse
24 consent or that Ranger Cloutier had not followed through on procuring a warrant.  See Taylor, 60
25 F.4th at 1243 ("[T]hat officers never informed Taylor he had a right not to consent is at least a
26 factor that weighs against voluntariness.").

27

28

1   Defendant argues that his response in the car[5] was not unequivocal but, rather, resigned.

2   Additionally, Defendant argues that adding to the earlier failure to provide Mr. Aguirre with the

3   information he needed to make a voluntary decision, the chaotic blood draw at the jail was

4   highly coercive and gave him no opportunity to decide whether he still consented to the blood

5   draw or not.   Specifically, in a span of minutes, Mr. Aguirre was handcuffed, asked for his

6   lawyer, was told he could talk to his lawyer at the hospital, was taken out of the jail, was taken

7   back into the jail, was unhandcuffed, and was placed into a chair for a blood draw.  When he

8   asked for water, he was told that he could have some after the blood draw, perhaps contingent on

9   his cooperation.[6]   Defendant argues these highly coercive conditions—in which the rangers

10  hinged the exercise of his right to an attorney and a simple drink of water on his continued

11  compliance—show that Mr. Aguirre's will was overborne and he did not provide voluntary,

12  unequivocal or specific consent to the warrantless blood draw.

13          3.      The Court Finds Consent was Specific and Unequivocal

14  "A suspect may 'unequivocal[ly] and specific[ally]' consent by giving express

15  permission, or consent can be inferred from conduct, such as a head nod." Taylor, 60 F.4th at

16  1243 (quoting Basher, 629 F.3d at 1167-68).   "Ultimately, the test 'is that of objective

17  reasonableness—what would the typical reasonable person have understood by the exchange

18  between the officer and the suspect?' " Taylor, 60 F.4th at 1243–44 (quoting Florida v. Jimeno,

19  500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)).  The Court finds the statements and

20  actions that occurred throughout the video evidence are sufficiently clear to convey that

21  Defendants' consent was being provided for a particular request, and a reasonable person would

22  have understood the exchange between the rangers and Mr. Aguirre as giving consent to conduct

23

24  [5]  As noted above, the Defendant at this point appeared to use the phrase "Blood test, yes," at this point, while in initial briefing the Defendant utilized the term "Okay, sure."  (See Gov. Ex. 2 at 25:32–25:36; Mot. 5.)

25  [6]  Defendant argues that while the "cooperate and you'll get some water" remark was made by the phlebotomist, not
26  one of the arresting officers, Mr. Aguirre had no reason to believe that he was not required to comply with her instructions just as he would a ranger's.  Moreover, Ranger Morrison had also told him that he could have water
27  after the blood draw, and neither ranger spoke up to say that he would not be deprived of water should he choose not to consent to the blood draw.  However, as discussed herein, when Mr. Aguirre asked for water initially, Ranger
28  Cloutier immediately responded by asking the detention center nurse if she had a bottle of water.  (Gov. Ex. 2 at 1:40:34–35.)

1 a blood test.

2       In briefing, the Government argues that Defendant provided unequivocal and specific

3 consent by stating "Blood test, yes" in response to Ranger Cloutier's question as to Defendant's

4 continued willingness to allow a blood draw.  The Government further argues that even

5 assuming *arguendo* Defendant had instead answered "Okay, sure," a reasonable person would

6 still understand that statement, while not particularly eloquent, formal, or enthusiastic, as a clear

7 indication of assent to the request for a blood draw.  First, both parties argue it is not dispositive

8 to their position whether Mr. Aguirre stated "Blood test, yes," or "Okay, sure."  At the hearing,

9 Defense counsel agreed that the video evidence did reflect that Mr. Aguirre stated "Blood test,

10 yes," and the Court finds based on its review of the video evidence that Mr. Aguirre stated

11 "Blood test, yes."  The Court notes that the audio is more clear on Ranger Cloutier's bodycam

12 video (Gov. Ex. 2 at 25:32–25:36), compared to Ranger Morrison's bodycam video of the same

13 timeframe (Gov. Ex. 3 at 41:55-42:00).

14       Courts routinely find unequivocal and specific consent in like circumstances, and indeed,

15 courts often find valid consent under circumstances where the language utilized is less clear than

16 here.  See Richey v. Att'y Gen. of Arizona, No. CV-18-04667-PHX-DJH, 2021 WL 5040396, at

17 *2 (D. Ariz. Oct. 29, 2021) (holding in agreement that it "was not an unreasonable determination

18 of the facts to infer consent from both the 'yes' and the 'I'll do whatever' responses[,] [as]

19 '[r]ecitation of magic words is unnecessary; the key inquiry focuses on what the typical

20 reasonable person would have understood by the exchange between the officer and the suspect . .

21 . [b]oth phrasings indicate a willingness to participate in the blood draw [and while] 'I'll do

22 whatever' may be less formal or eloquent, or more open ended than requested, [] it plainly

23 communicates to a reasonable person that the speaker is agreeing to whatever action has been

24 requested." (quoting United States v. Stewart, 93 F.3d 189, 192 (5th Cir. 1996)) (citing United

25 States v. Torres-Sanchez, 83 F.3d 1123, 1126 (9th Cir. 1996))); Taylor, 60 F.4th at 1244 ("When

26 Gariano asked if there were guns in the car and then asked if he could 'check,' Taylor

27 unambiguously responded, 'it don't matter to me[,]' [and] [i]n context, a reasonable person

28 would have understood Taylor to be consenting to a search of the car for firearms in locations

1   where a gun might be concealed."); <u>Torres-Sanchez</u>, 83 F.3d at 1126 (where officer "explained,
2   'Do you mind if I look and search in the vehicle,' this time emphasizing the word *search*[,]
3   [and] Sanchez allegedly responded, 'Yeah, go ahead, if you want to[,]' "); <u>United States v.</u>
4   <u>Brooks</u>, 786 F. App'x 101, 102 (9th Cir. 2019) ("Appellant responded with a clear and
5   unequivocal 'sure' when the TPD officers asked to frisk him, and the record supports that his
6   consent 'was given freely and voluntarily.' ") (citations omitted); <u>United States v. Garcia</u>, 997
7   F.2d 1273, 1281 (9th Cir. 1993) ("Here, the officers tricked Garcia into opening the door,
8   grabbed the door, flashed a badge and said, 'we'd like to talk to you.' Garcia said, 'okay,' nodded
9   and stepped back . . . The district court, however, determined that Garcia understood the request
10  to talk as a request to enter, a finding that is not clearly erroneous . . . consent to enter can be
11  inferred from Garcia's step back, which the district court found cleared the way for the officers'
12  entry."); <u>United States v. Pace</u>, 709 F. Supp. 948, 952–53 (C.D. Cal. 1989) ("[T]he Government
13  has met its burden in proving that Defendant's consent to pat down his outer garments was given
14  freely and voluntarily . . . when the Agents asked Defendant if he would consent to a pat down
15  search, they did not threaten or verbally abuse him, display or draw their weapons, or use any
16  handcuffs or other incidents of arrest[,] Defendant understood the Agents' request, responding
17  'okay' when asked if the Agents could pat him down [and] [w]hile the Agents did not tell
18  Defendant that he was free to decline to consent to the pat down search, the Constitution does not
19  require 'proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a
20  search.' " (quoting <u>Schneckloth</u>, 412 U.S. at 234)), <u>aff'd</u>, 893 F.2d 1103 (9th Cir. 1990).[7]

21      While Defendant argues his words were "not unequivocal but, rather, resigned," the
22  Court finds the Defendant's statement in response to the Ranger's question in the car was

---

[7] <u>See also</u> <u>United States v. Franklin</u>, 630 F.3d 53, 56 (1st Cir. 2011) ("Yeah, do what you got to do."); <u>United States v. Canipe</u>, 569 F.3d 597, 604 (6th Cir. 2009) ("He responded positively and unambiguously that it 'wouldn't be a problem' for Hagie to search his truck."); <u>United States v. $117,920.00 in U.S. Currency</u>, 413 F.3d 826, 827 (8th Cir. 2005) ("The trooper requested Soosan's permission to search the car, and he later testified that Soosan had replied with 'something to the effect of 'I guess if you want to.' "); <u>United States v. Zubia-Melendez</u>, 263 F.3d 1155, 1163 (10th Cir. 2001) ("The officer then asked again to search the vehicle and Appellant replied 'Yeah, no matter.' ").

1    unequivocal and specific.[8]   As the Government notes, enthusiasm is not necessary to find the

2    consent to be unequivocal.  See United States v. Faruolo, 506 F.2d 490, 495 (2d Cir. 1974) ("No

3    person, even the most innocent, will welcome with glee and enthusiasm the search of his home

4    by law enforcement agents.").  Further, while either phrasing between "Blood test, yes," or

5    "Okay, sure," can be sufficient as shown in the above caselaw, the Court's conclusion that

6    Plaintiff stated "Blood test, yes," adds to the specificity of the statement of consent, and adds to

7    the consent being unequivocal as it is clear that Mr. Aguirre was responded to a request for a

8    blood test specifically, and unequivocally stated "yes" as applied to the specific request for a

9    blood test.

10           Accordingly, the Court concludes the Defendant's consent was unequivocal, and specific

11   to a blood draw test.

12           4.     The Court Finds Defendant's Consent was Voluntary

13           The Court now turns to consider the factors applicable to determining the voluntariness

14   of the consent.

15           a.     Custody

16           The Government acknowledges Defendant was in custody, but states this factor is of

17   limited significance.  Defendant responds that whether a defendant is in custody is not of limited

18   significance to the court's analysis but instead is considered in totality with the other factors.

19   The Court agrees with Defendant that it is relevant as one of several factors in the totality of the

20   circumstances analysis, and not automatically a factor of limited significance.  See United States

21   v. Washington, 490 F.3d 765, 776 (9th Cir. 2007) ("Although two factors favor the government

22   and two favor Washington, our conclusion that Washington would not have felt free to depart, in

23   the particular circumstances presented, raises grave questions on whether his consent to the car

24   search can be considered voluntary.").

25           However, the Court largely agrees with the Government that consideration of the weight

26

27   [8] The Government proffers that Defendant does not appear to challenge the requirement that consent be "specific."
     (Opp'n 14 n. 6.)  It is true, that aside from mentioning one time generally that he "did not provide voluntary,
28   unequivocal or specific consent to the warrantless blood draw" (Mot. 10), Defendant does not expressly present
     arguments concerning the term "specific" in the opening or reply briefs.

of the factor of custody here, in light of the totality of the video evidence and statements provided by the Defendant in response to the manner of questioning and by the officers in light of the manner of custody, does not heavily weigh against finding voluntariness of the consent. Therefore, in this case, it does have somewhat limited weight in light of the totality of the circumstances.  See United States v. Lindsey, 877 F.2d 777, 783 (9th Cir. 1989) ("A person in custody is capable of giving valid consent to search."); United States v. Alfonso, 759 F.2d 728, 741 (9th Cir. 1985) ("The fact of custody does not itself negate voluntariness."); Alexander v. Cim Chino Prison, No. 519CV01332VBFSP, 2023 WL 3551323, at *5 (C.D. Cal. Mar. 27, 2023) ("That plaintiff was in custody and handcuffed is offset here by plaintiff's awareness of her right to refuse consent and her testimony that she initially refused to consent to Marquez's request to a search."); see also United States v. Patayan Soriano, 361 F.3d 494, 503–04 (9th Cir. 2004) ("The dissent, citing United States v. Ocheltree, 622 F.2d 992, 994 (9th Cir. 1980), argues that the threat of custody can be more coercive than actual custody.  But that was not likely the case here.").

The Court turns to consider the other factors in relation to the Defendant's status of being in custody.

**b.    Weapons Not Drawn**

Ranger Cloutier and other officers on scene never drew their guns at Defendant at any point in their interactions.  The Court finds this factor favors finding Defendant's consent voluntary.

**c.    Miranda Warnings**

Ranger Cloutier gave Miranda warnings to Defendant at the time of arrest.  The Court finds this factor weighs in favor of finding Defendant's consent voluntary.  See Alfonso, 759 F.2d at 741 ("The failure to receive Miranda warnings is another factor to be considered . . . as is also the delay in receipt of the warnings." (citations omitted)).

**d.    Right to Refuse Consent**

The Government argues that while there were no express statements regarding the right to refuse consent, Defendant's spontaneous statement regarding blood draws, and prior exercise

1   of the right to refuse, negates concern that the consent was involuntary.   The Government

2   highlights that after refusing to continue with SFSTs, Defendant, without any prompting,

3   volunteered to take a blood test, and that given that spontaneous comment, the later request

4   regarding the blood draw served to confirm the understanding that Defendant, was and remained

5   willing to consent to such a search.   The Government proffers that based on its view of the

6   evidence, Defendant, in fact, even confirmed that the test would be a blood test prior to

7   consenting during the ride to the detention center.

8          The Defendant replies that the Government's argument that because Mr. Aguirre knew of

9   his right to refuse to perform SFSTs, he would similarly be aware of his right to refuse to consent

10  to a blood test, is based on the incorrect assumption that the two rights are the same, when the

11  Supreme Court has made clear that the right to refuse consent to a blood draw is fundamentally

12  different from the right to refuse consent to field sobriety tests and breath tests.   The Supreme

13  Court has held "that motorists cannot be deemed to have consented to submit to a blood test on

14  pain of committing a criminal offense."   Birchfield v. North Dakota, 579 U.S. 438, 477, 136 S.

15  Ct. 2160, 2186, 195 L. Ed. 2d 560 (2016) ("It is another matter, however, for a State not only to

16  insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit

17  to such a test.").

18         Defendant argues that before arresting him, Ranger Cloutier correctly informed Mr.

19  Aguirre that his refusal to perform field sobriety tests could be used against him in court, but not

20  only was Mr. Aguirre never informed of his right to refuse consent to a blood test, by the

21  Government's own argument that the refusal rights are identical, he reasonably would have been

22  under the mistaken impression that refusal to consent to a blood test could be used against him—

23  something that is not true under federal law.   See Birchfield, 579 U.S. at 477; c.f. United States

24  v. Harrison, 749 F.3d 825, 829-30 (9th Cir. 2014) (in the Due Process context, holding that

25  fundamental fairness concerns were implicated where the defendant received a warning about his

26  right to refuse testing that was "affirmatively misleading").

27         While it is true Mr. Aguirre chose to refuse to perform the SFSTs, indicating a general

28  ability to refuse to comply to such tests, thereafter, the officer indicated that the refusal to do

those tests could be used against him.  In this regard, Defendant is correct it was not absolutely made clear or delineated, on scene at the side of the road, that refusal to a blood test is construed differently than refusal to comply with SFSTs.  However, the totality of the exchanges weigh in favor of the Government.  Although there was some overlap in the initial discussion regarding the fact the refusal to complete SFSTs could be used against Defendant in court, this was due to Defendant's own spontaneous offer to submit to a blood test, apparently because he thought it would favor him as shown by later statements by the Defendant, and the Court finds Ranger Cloutier sufficiently explained the fact that he could get a warrant for a blood test, or Defendant could complete the SFSTs and leave, which Defendant then attempted to do.[9]

---

[9] This specific exchange, which occurred prior to the conversation regarding consent in the vehicle, is as follows:

RC: Are you going to perform the tests or not?

AA: No.

RC: You're not going to perform any tests? Okay. You realize that can be used against you in court, correct? That you're refusing?

AA: [Nods].

RC: Okay, so you're not going to commit to do those tests?

AA: You can do a blood test, or whatever you test. Whatever.

RC: Okay. We can get a warrant to do those things, or we can do these tests and if you pass them you can just go.

AA: I don't have to go. I have family who can drive.

RC: Right, but you were driving at the time of the accident. I want to determine if you were intoxicated when you had this accident.

AA: Oh, you want to know if I was driving intoxicated?

RC: Correct. If you would perform these tests—

AA: All right.

RC: Are you willing to do that?

AA: I am willing to do that.

(Gov. Ex. 1 at 4:40-5:30).  The Court notes that given the manor and inflection in Mr. Aguirre's voice in this exchange, it appears Mr. Aguirre decided to comply with the tests when he was informed the purpose was to determine whether he was intoxicated while driving previously, rather than the ranger trying to determine if he was then intoxicated and unable to drive away from the scene.

1    The Court finds that based on the initial spontaneous offer to give a blood test after

2    initially deciding to stop the SFSTs, in relation to the confirmation of consent specifically to the

3    blood test at later points, weighs in favor of finding the Defendant was aware of the right to

4    refuse consent.  United States v. Brown, 563 F.3d 410, 416 (9th Cir. 2009) ("Although Agent

5    Watson admittedly did not notify Rishel that she had a right not to consent to search, this factor

6    is not an absolute requirement for a finding of voluntariness, . . . and also seems inapposite given

7    that Rishel volunteered consent without any prompting whatsoever." (citing Schneckloth, 412

8    U.S. at 248–49)); United States v. Elima, No. SACR 16-00037-CJC, 2016 WL 3546584, at *8

9    (C.D. Cal. June 22, 2016) ("This spontaneous provision of consent strongly implies

10   voluntariness, in addition to the other indicia of voluntariness discussed *supra* in the context of

11   Defendant's general statements."); United States v. Meza-Corrales, 183 F.3d 1116, 1125 (9th

12   Cir. 1999) (among other indications, defendant "demonstrated by his prior refusal to consent that

13   he knew that he had such a right-a knowledge that is highly relevant in our analysis of whether a

14   consent is voluntary.").

15   The Government, acknowledging that although Defendant's prior exercise of the right

16   was to SFSTs specifically, proffers Ranger Cloutier's requests for SFSTs, breath, and blood tests

17   were asked in a similar manner.  Therefore, the Government argues that it would thus be

18   reasonable to conclude that Defendant was aware of his right to refuse to consent as to all three

19   tests, and the Government argues the mere asking of consent, in fact, supports the conclusion that

20   Defendant understood he could refuse consent.  See People v. James, 19 Cal. 3d 99, 116, 561

21   P.2d 1135, 1145 (1977) ("[W]hen a person of normal intelligence is expressly asked to give his

22   consent to a search of his premises, he will reasonably infer he has the option of withholding that

23   consent if he chooses."); United States v. Langford, No. 22-10041, 2023 WL 195541, at *2 (9th

24   Cir. Jan. 17, 2023) ("An agent testified that he asked Langford for consent to search his vehicle,

25   which indicates that Langford understood he could refuse consent.").

26   The Court finds this argument, and Langford's language specifically, has varying levels

27   of significance to this case.  Defendant first responds that Langford is unpublished, and

28   emphasizes that the case was decided after a jury trial—making the court's review of the facts

1   more favorable to the government than it would be in a traditional suppression case.[10]  Defendant

2   also argues the proposition contradicts decades of case law finding that the fourth factor weighed

3   against voluntariness in cases where an officer asked for consent but did not inform the subject

4   of his right to refuse that consent.  See Taylor, 60 F.4th at 1243 ("[T]hat officers never informed

5   Taylor he had a right not to consent is at least a factor that weighs against voluntariness."); see

6   United States v. Chan-Jimenez, 125 F.3d 1324, 1327 (9th Cir. 1997) ("Officer Price did not

7   administer Miranda warnings, nor did he inform Chan–Jimenez of his right to refuse to consent

8   [and] [i]n addition, the officer kept his hand on his revolver at all times.").

9          As relevant to the exchange where Ranger Cloutier stated he could get the warrant for the

10  blood test or Mr. Aguirre could perform the other tests and go, the statement in Langford

11  continues as follows, and was not discussed by the Government or Defendant here: "An agent

12  testified that he asked Langford for consent to search his vehicle, which indicates that Langford

13  understood he could refuse consent.  The agents never threatened Langford, nor did they notify

14  him that his failure to give consent would be futile because a search warrant could be obtained."

15  Langford, 2023 WL 195541, at *2.  Here, there appears to be various specific facts that make it

16  difficult to say the statements in Langford, and the parties' arguments overall are determinative

17  to this factor taken in isolation.  Here, Defendant initially offered to do a blood test, and was later

18  asked for consent on multiple occasions.  However, when Defendant initially volunteered the

19  option of the blood test, Ranger Cloutier stated they could get a warrant for that, or Mr. Aguirre

20  could complete the SFSTs, and thus there could be an implication that if Defendant refused a

21  blood test, the refusal could be futile because a warrant would be obtained.  However, that is not

22  the manner in which the exchange occurred as discussed above.  The volunteering of the blood

23  test, and the manner in which the Ranger asked for later affirmance of consent to the blood test

---

24  [10]  It is true that the Langford court noted the review was both favorable to the verdict and subject to the clearly

25  erroneous standard: "Under the Washington factors, when viewed in the light most favorable to the verdict, the
    district court's determination that Langford consented to the search of his vehicle was not clearly erroneous."

26  Langford, 2023 WL 195541, at *2.  It is not clear what impact that additional statement concerning the standard of
    review had, given the clearly erroneous standard is generally applicable.  See United States v. Reid, 226 F.3d 1020,
    1026 (9th Cir. 2000) ("We will not disturb a district court's determination that a person's consent to search was

27  voluntary unless that determination was clearly erroneous." (citation and internal quotation marks omitted)); see also
    Langford, 2023 WL 195541, at *1 ("We may affirm a district court's denial of a motion to suppress on any basis

28  supported in the record." (quoting United States v. Ruiz, 428 F.3d 877, 880 (9th Cir. 2005))).

1   does indicate Mr. Aguirre understood he could refuse to consent to the blood test, and opted for

2   the blood test as the better option for him.  Like in <u>Langford</u>, the rangers never threatened Mr.

3   Aguirre, nor specifically stated that the failure to give consent would be futile because a search

4   warrant would be obtained.  The reference to a search warrant was only to notify Defendant that

5   he could do the SFSTs instead, and potentially be done quicker, and he chose that option at that

6   time, and then later again consented to a blood test.

7          As for Defendant's arguments concerning the lack of clarity as to the ranger's statements

8   concerning getting a warrant for the SFSTs, and that refusal to comply with those tests could be

9   used against him in court, <u>see</u> <u>Birchfield</u>, 579 U.S. at 477, the Government responds that on their

10  face, additional explanations to Defendant that a warrant could be obtained in lieu of consent and

11  that a warrant had not yet been obtained do not affect Defendant's knowledge of his right to

12  refuse consent (unless they were stated in a threatening manner—akin to the fifth factor

13  analysis).  The Court does not necessarily agree with the Government that the ability of the

14  discussion of the warrant could not affect the Defendant's knowledge of the right to refuse

15  consent, as discussed above, but that does not sway the analysis to Defendant, as discussed

16  throughout this opinion.

17         Relatedly, the Government argues the Defendant appears to be importing California

18  statutory requirements that have no bearing on the Fourth Amendment consent analysis.[11]  The

19  Court does find this impacts the weight of the potential lack of clarity and overlap in discussions

20  between the rangers and the Defendant.  <u>See</u> <u>Nelson</u>, 143 F.3d at 1203 ("While failure to advise

21  DUI arrestees of their choice of tests appears to violate the California implied consent statute,

22  such a failure does not violate the Fourth Amendment's reasonableness requirement."); <u>see also</u>

23  _____

24  [11] Additionally, as the Government suggests, the California implied consent statute, even if applicable in lieu of the implied consent requirements of 36 C.F.R. § 4.23, would appear to not require a choice of alternatives to be provided where, as here, a breath test was not available.  <u>See</u> Cal. Veh. Code § 23612(d)(2) ("If a blood or breath

25  test is not available under subparagraph (A) of paragraph (1) of subdivision (a), or under subparagraph (A) of paragraph (2) of subdivision (a), or under paragraph (1) of this subdivision, the person shall submit to the remaining

26  test in order to determine the percent, by weight, of alcohol in the person's blood. If both the blood and breath tests are unavailable, the person shall be deemed to have given his or her consent to chemical testing of his or her urine and shall submit to a urine test.").  In this regard, the Government notes the Ninth Circuit does recognize an

27  excessive force claim where breath or other tests are "actually available" but officers still insist upon obtaining blood draws from those who requested or consented to do the other tests.  <u>See</u> <u>Nelson v. City of Irvine</u>, 143 F.3d

28  1196, 1203 (9th Cir. 1998).

People v. Harris, 234 Cal. App. 4th 671, 691–92, 184 Cal. Rptr. 3d 198, 215 (2015) ("There is nothing in the record to support defendant's suggestion that Deputy Robinson intentionally deceived him about the contours of the implied consent law . . . [a]s the appellate division recognized in its opinion, failure to strictly follow the implied consent law does not violate a defendant's constitutional rights . . . [under the totality of the circumstances, we conclude that defendant freely and voluntarily consented to his blood being drawn, and that he was not coerced or tricked into submitting to the blood test."); Mitchell v. Wisconsin, 204 L. Ed. 2d 1040, 139 S. Ct. 2525, 2533 (2019) ("[O]ur decisions have not rested on the idea that these laws do what their popular name might seem to suggest—that is, create actual consent to all the searches they authorize [but] [i]nstead, we have based our decisions on the precedent regarding the specific constitutional claims in each case, while keeping in mind the wider regulatory scheme developed over the years to combat drunk driving.").

Ultimately, if the Court only considered the factor in isolation and only at its express terms (whether the defendant was *notified* that he had a right not to consent), the Court would likely have to find the factor weighs slightly in favor of Defendant.  However, given the totality of the circumstances surrounding the discussion of consent, the warrant, and the spontaneous offer, in relation to other factors, as expressed and others relevant to the facts at hand case,[12] the Court finds the fourth factor weighs slightly in favor of the Government in finding the consent was ultimately voluntary.  Brown, 563 F.3d at 416 ("[F]actor is not an absolute requirement for a finding of voluntariness, . . . and also seems inapposite given that Rishel volunteered consent without any prompting whatsoever." (citing Schneckloth, 412 U.S. at 248–49)); Elima, 2016 WL 3546584, at *8 ("[S]pontaneous provision of consent strongly implies voluntariness."); Meza-Corrales, 183 F.3d at 1125   (among other indications, defendant "demonstrated by his prior refusal to consent that he knew that he had such a right-a knowledge that is highly relevant in our analysis of whether a consent is voluntary.").

---

[12] See Estrada, 632 F.3d at 1082 ("Because each factual situation surrounding consent to a search is unique, we may also take into account any other factors that we deem relevant."); Patayan Soriano, 361 F.3d at 502-503 ("[T]hese factors are guideposts to consider in assessing the voluntariness of consent, not a checklist of requirements to be satisfied." (citations and quotation marks omitted)).

"The government [is] not required to prove that [Mr. Aguirre] knew he had a 'right to refuse consent' as a 'necessary prerequisite to demonstrating a voluntary consent.' " Taylor, 60 F.4th at 1243 (quoting Schneckloth, 412 U.S. at 232–33).  Overall, the Court does not find the Mr. Aguirre's "will [was] overborne and his capacity for self-determination critically impaired." Id. (quoting Schneckloth, 412 U.S. at 225).  Therefore the Court concludes that based on the initial spontaneous offer to give a blood test after first deciding to stop the SFSTs, in relation to the confirmation of consent specifically to the blood test at later points, and consideration of the policy reasoning behind the factor, weighs in favor of finding the Defendant was *aware* of the right to refuse consent, and chose to consent to the blood test.

e.       **Whether the Defendant was Informed a Search Warrant Could be Obtained**

The fifth factor considers 'whether the defendant had been told a search warrant could be obtained." Taylor, 60 F.4th at 1243.  [T]he application of the fifth factor depends on the particular circumstances of the case and thus hinges on whether a suspect is informed about the possibility of a search warrant in a threatening manner." United States v. Cormier, 220 F.3d 1103, 1112 (9th Cir. 2000).  As relevant to the parties' arguments, the Ninth Circuit discussed the contours and meaning of the factor in Cormier, first noting "[t]he fifth factor, whether the defendant was told that a search warrant could be obtained, has been the source of some disagreement in this Circuit," and observing:

> *United States v. Kim,* 25 F.3d 1426, 1432 (9th Cir.1994), for example, this Court found that the failure to inform a defendant that a search warrant could be obtained supports a finding that a defendant freely and voluntarily consented to a search. According to *Kim,* the reason for that view is that threatening a defendant with a search warrant intimates that the "withholding of consent would ultimately be futile." *Id.* at 1432. In contrast, in *Torres–Sanchez,* we took the opposite approach, hinting that the failure to inform a defendant that a search warrant could be obtained constituted a failure to apprise him of all his legal rights, similar to not providing *Miranda* warnings once a suspect is in custody. *See Torres–Sanchez,* 83 F.3d at 1130. It appears, therefore, that the application of the fifth factor depends on the particular circumstances of the case and thus hinges on whether a suspect is informed about the possibility of a search warrant in a threatening manner. In this case, the district court concluded that Peters' failure to inform Cormier that she could obtain a search warrant supported its view that Cormier freely and voluntarily consented to the search. Under the particular circumstances of this case, the district

1    court's decision was not clearly erroneous.

2  Cormier, 220 F.3d at 1112.

3       The Government argues Ranger Cloutier did not threaten, but merely informed Defendant

4  that a warrant could be obtained for a blood test in response to Defendant's request for a blood

5  test in lieu of SFSTs.[13]   Thus, the Government contends, in context, Ranger Cloutier appeared to

6  mention the possibility of a warrant to suggest that the process of obtaining a blood test would

7  take longer than simply performing the SFSTs—to encourage consent to SFSTs rather than to

8  sway Defendant into allowing a blood test.

9       The Court discussed above some of the overlapping and various considerations given the

10 notification of ability to withhold consent at the similar timeframe as the ranger's reference to

11 the warrant after the Defendant's initial spontaneous offer to give a blood test.   Based on

12 consideration of the video evidence as a whole, the Court agrees with the Government, that

13 Ranger Cloutier's reference to search warrants thus cannot reasonably be viewed as a threat

14 designed to "intimate[] that the withholding of consent would ultimately be futile" as to the later

15 blood draw.  Cormier, 220 F.3d at 1112 (internal quotation marks and citation omitted).

16      Defendant replies that the Government is incorrect that Cormier's "threatening manner"

17 language is controlling in this case, as in Cormier, the defendant was not informed that a warrant

18 could be obtained, meaning any discussion of exactly how that message should be delivered was

19 dicta.  See Cormier, 220 F.3d at 1112.  Moreover, Defendant notes "threatening manner" is not

20 defined in Cormier, and neither case it cites to support its dicta nor uses the word "threat" while

21 discussing this factor.  See United States v. Kim, 25 F.3d 1426, 1432 (9th Cir. 1994); Torres-

22 Sanchez, 83 F.3d at 1130.  Defendant proffers that like the other factors, the fifth factor is a way

23 for the court to assess coercion.  See Kim, 25 F.3d at 1432 (explaining that, by not claiming to be

---

24 [13]  If the Court were to take the "threatening manner" language without caveat, as the Government notes, even if the
25 statement could somehow be construed as threatening, the existing probable cause to justify the warrant would
significantly limit the weight of this factor.  See Patayan Soriano, 361 F.3d at 504–05 ("[W]hen probable cause to
26 justify a warrant exists, the weight of the fifth factor is significantly diminished.").  While the Court does not simply
take the "threatening manner" language as absolutely clearly applied to each fact, given the probable cause in this, to
27 any extent this factor would weigh in favor of Defendant, it would be slight, and any weight would be reduced by
the totality of circumstances and other non-stated factors that are relevant.  See Estrada, 632 F.3d at 1082 ("Because
28 each factual situation surrounding consent to a search is unique, we may also take into account any other factors that
we deem relevant.").

able to obtain a search warrant immediately, officers did not "intimate that Kim's withholding of consent would ultimately be futile or, correlatively, that his grant of consent . . . would thus be legally unprejudicial to him"). Thus, Defendant submits that Ranger Cloutier's statement that he could get a warrant for a blood draw could reasonably be understood as communicating that withholding consent would be futile.

First, the Court notes that both parties cite Taylor as the primary case outlining the five factors for assessing voluntariness of consent. Therein, Taylor uses the word "threaten" in a totality of the circumstances discussion of the overlapping factors:

> Here, Taylor was not in custody, so no *Miranda* warnings were given or required, *see Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); officers did not have their guns drawn; and the officers never threatened Taylor that a search warrant could be obtained if he refused consent.

Taylor, 60 F.4th at 1243; see also United States v. Gilbreath, 161 F. App'x 700, 702 (9th Cir. 2006) ("There was evidence that the agents informed Gilbreath that they did not have a search warrant, that no threats were made, and that Gilbreath signed a consent form which explained his right to refuse consent."); United States v. Rodriguez-Preciado, 399 F.3d 1118, 1130–31 (9th Cir.) ("At the time he consented, the officers' guns were not in hand, he had already been informed of his Miranda warnings, and no threat had been made that a search warrant could be obtained if he refused consent.").

To be clear Court does not believe the mention of a warrant needs to be construed to have been made in an *aggressively* threatening manner. In this regard, simply the threat *of* a search warrant can signify the withholding of consent could be futile, stated in many different manners or demeanors, depending on the situation. However most importantly here and apparently determinative to this factor, the Court does not find the manner in which Ranger Cloutier mentioned that he could get a search warrant for the blood test or that Defendant could perform the other tests and be on his way, was an attempt at "threatening a defendant with a search warrant [that] intimates that the 'withholding of consent would ultimately be futile.' " Cormier, 220 F.3d at 1112 (quoting Kim, 25 F.3d at 1432). The Court finds this factor weighs in favor of finding the consent voluntary.

1          **f.      Other Considerations**

2          In addition to the five primary factors, the Government also argues that Ranger Cloutier's

3    and the other rangers' friendly and professional demeanors generally throughout the entirety of

4    the encounter also weigh in favor of finding Defendant's consent voluntary.

5          The Court finds this a relevant factor, with some overlap with the other factors in this

6    case.  See Estrada, 632 F.3d at 1082 ("Because each factual situation surrounding consent to a

7    search is unique, we may also take into account any other factors that we deem relevant.");

8    Patayan Soriano, 361 F.3d at 502-503 ("[T]hese factors are guideposts.").

9          Starting with the first factor of custody, it seems there is overlap in that the negative

10   impact of custodial status, in that a particularly harsh treatment in custody, with aggressive

11   demeanors could of course make a person's consent less voluntary.  However, there is also an

12   argument that a particularly cheerful demeanor, utilized as subterfuge, for example in relation to

13   a lack of information concerning the ability to not consent, would be a coercive tactic.

14         Second, a friendly demeanor would impact the second factor of whether guns were

15   drawn.  In this regard, perhaps the second factors could be thought of falling under more broad

16   umbrella of professional and courteous demeanor as appropriate to the type of interaction.  This

17   would allow the second factor more nuance and the ability to have a more relevant application to

18   all cases.  In other words, the overall demeanor could be thought of as a spectrum, with an

19   interaction with guns drawn toward one end of such spectrum.

20         As to the third factor and the impact of the reading of Miranda rights on the Defendant,

21   simply put, the demeanor in which the suspect is treated when being read his rights could impact

22   the way the Defendant understands and decides to potentially exercise their Miranda rights.

23         Fourth, whether the Defendant's will was overborne in relation to notification and

24   knowledge of the ability to consent, could seemingly be easily changed depending on the context

25   and overall demeanor of the officers of the course of the interaction.

26         Similarly, the fifth factor of whether the Defendant was notified a search warrant could

27   be obtained, particularly as to the threatening component discussed above, does have an apparent

28   susceptibility to change based on the overall demeanor and interactions surrounding the way a

1  Defendant was notified that a search warrant could be obtained.

2        Whether the Court considers it an additional factor, or one that is essentially relevant to

3  all of the factors, or both, based on review of all the video evidence, the Court finds the overall

4  demeanor of the officers in relation to the Defendant and the overall interactions, demonstrates to

5  the Court that based on the *totality* of the circumstances, the Defendant's consent was voluntarily

6  given. See Brown, 884 F.2d at 1311–12 ("No threats, show of force, or restraints were employed

7  at the time the detectives asked for Brown's consent to the search[;] detectives did not use a harsh

8  or intimidating tone of voice;[]Brown was informed that he was free to leave[;] [h]e made

9  statements throughout the encounter which manifested understanding of what was occurring.");

10 United States v. Hernandez, No. CR-10-121-E-EJL, 2011 WL 447451, at *7 (D. Idaho Feb. 4,

11 2011) (in the context of determining whether there was custodial status, noting "the officers'

12 conversations with the Defendant did not produce a coercive atmosphere [but] [j]ust the

13 opposite, the conversations appeared to be cordial and professional.").

14       Thus this factor as a separate relevant factor, or as impacting the analysis of the five

15 express factors above, weighs in favor of finding the consent voluntary.  Considering all factors

16 and the totality of the circumstances, the Court finds the Defendant gave voluntary,

17 unequivocable, and specific consent to a blood draw.

18       **g.**     **Whether Consent was Withdrawn or Revoked**

19       The Government, while acknowledging consent may be revoked, argues later events

20 cannot be used to challenge the validity of the earlier consent, which the Government argues is

21 what the Defendant is more precisely arguing rather than arguing consent was revoked.  The

22 Government frames the Defendant as taking the position that later events are only relevant to

23 whether the earlier consent was revoked, and if so, whether consent was again obtained

24 following that revocation.  (See Mot. at 10 (arguing that Defendant lacked opportunity to decide

25 if "he still consented to the blood draw")[14]  The Government contends Defendant, however, does

26 not even attempt to argue that consent was validly revoked but instead improperly claims that

27 _____

28 [14]  The Court notes this is in the factual background portion of Defendant's motion to suppress, not even necessarily the argument portion.

1    alleged coercion at the detention center requires finding involuntary the consent obtained an hour

2    earlier.  The Government submits that the events at the detention facility simply have no bearing

3    on whether Defendant provided voluntary, unequivocal and specific consent during the ride to

4    the facility.

5        The Court agrees with the Government insofar as there was valid consent to the blood

6    draw given, as the Court found above, and that consent was not revoked based on any event or

7    combination of events that occurred at the detention facility.

8        The Government proffers revocation requires "an unequivocal act or statement of

9    withdrawal" that a "reasonable person would . . . construe . . . as a withdrawal of, or limitation

10   on, [the defendant's prior] consent to search." United States v. Sanchez, 854 F. App'x 857, 861

11   (9th Cir. 2021).  It does not appear the parties provided a published opinion, and the Court could

12   not locate one, specifically stating a standard for revocation of consent, but this standard has

13   been applied at least a decade before Sanchez.  See United States v. Hughes, No. CR 05-759-

14   PHX-EHC, 2006 WL 1515918, at *4 (D. Ariz. May 26, 2006) ("Consent to search may be

15   withdrawn if "an intent to withdraw consent [is] made by unequivocal act or statement." (quoting

16   United States v. Sanders, 424 F.3d 768, 774 (8th Cir.2005))), aff'd, 273 F. App'x 587 (9th Cir.

17   2007) ("We conclude that the district court did not clearly err when it found that his intent to

18   withdraw consent to search the apartment was not objectively clear and unequivocal when it was

19   communicated to officers who had no reason to know that he had granted such consent.").

20       It would seem appropriate to consider incorporating the possibility of revocation or

21   withdrawal of consent into the totality of the circumstances analysis, and thus the events at the

22   later time are simply part of such analysis of the totality of events leading up to the actual search.

23   This would seem in line with Sanchez in most regards, in that this essentially means the consent

24   was unequivocal, specific and voluntary, and was not withdrawn before the search occurred,

25   based on analysis of the five factors and other relevant factors during the entirety of the relevant

26   time period.  See Sanchez, 854 F. App'x 857, 861 (9th Cir. 2021) ("Sanchez notes that, when

27   Kilpela asked for express consent to cut the spare tire, Sanchez did not say 'yes,' but instead said

28   'it's not my tire[,]' [b]ut a reasonable person would not construe that as a withdrawal of, or

1    limitation on, Sanchez's consent to search the car [and] [o]n the contrary, his disavowal of any

2    ownership of, or interest in, the rental car's spare tire would reasonably be understood as

3    greenlighting the search of the tire, even to the point of cutting it . . . [b]ecause a reasonable

4    person would have understood that Sanchez's consent extended to the tire and was never

5    withdrawn, the officers did not act unreasonably in searching the spare tire."); see also United

6    States v. Nothstein, 424 F. App'x 645, 646 (9th Cir. 2011) ("Once given, the consent was not

7    withdrawn [as] Nothstein did not once state that he wanted the officers to stop searching his

8    car[;] [h]is statements expressed merely reluctance concerning the continued search, which did

9    not equate to an unequivocal act or statement of withdrawal[;] [n]or was the atmosphere so

10   coercive that Nothstein was effectively prevented from withdrawing consent [and] [t]here was no

11   evidence of threats or show of force, Nothstein was not handcuffed, he was free to walk around

12   during the initial searches, and he was not prohibited from observing the initial searches.").

13          The Court largely agrees with the Government that at no point did Defendant suggest

14   through any statement or action that he was withdrawing consent, as no reasonable person would

15   consider, for example, the mere asking of water or request to talk to counsel[15] as an unequivocal

16   statement or action that Defendant was now seeking to withdraw his prior consent to the blood

17   draw; Defendant never stated or even suggested that his consent remained contingent on being

18   provided with either water or an attorney; and Ranger Cloutier's renewed question minutes prior

19   to the blood draw, asking if Defendant still consented to the blood draw, also provided a clear

20   opportunity for Defendant to withdraw consent expressly or to make it contingent on various

21   conditions; but Defendant, however, chose not to do so.  The Court agrees that the surrounding

22   circumstances and review of the video evidence, in fact, confirm that Defendant remained

23   convinced that a blood draw would work in his favor and wanted the test to be conducted.  Based

24   on the totality of the circumstances, and review of the video evidence, the Court reaffirms that

25   the consent was voluntary, unequivocal, and specific, and the consent was not withdrawn.

26   _____

27   [15]  Defendant did not present any argument concerning custodial interrogation and for example, whether the asking
     of counsel foreclosed the ability to perform the blood draw or ask for consent for the blood draw as a form of
28   custodial interrogation.

1.      <u>Whether Defendant Believed He Lacked Authority to Withdraw Consent</u>

The Government also argues Defendant similarly neither raised,[16] nor could succeed on the claim that the rangers' actions coerced him to believe that he had no authority to withdraw consent.  Conversely, the Defendant argues the Government's argument that Mr. Aguirre did not revoke consent, is not relevant because his consent was not validly given in the first instance.  However, for the reasons outlined in his initial motion, Defendant disagrees with the Government's characterization of the jail events as not coercive, and nothing that occurred at the jail changes the ultimate fact that Defendant did not provide valid consent.

In <u>McWeeney</u>, the Ninth Circuit addressed the factors relevant to determining whether officers intimidated or coerced an individual into believing they had no right to withdraw or limit their consent after given, providing additional non-exclusive factors:

> Under this analysis, the district court must determine whether the officers' conduct is objectively recognizable as intimidation directed mostly (or exclusively) at coercing McWeeney and Lopez into believing that they had no right to withdraw or delimit their consent once it was given, and whether a reasonable person faced with the officers' conduct would have believed that no such right existed. The non-exhaustive list of objective factors the district court should consider includes: (1) the language used to instruct the suspect; (2) the physical surroundings of the search; (3) the extent to which there were legitimate reasons for the officers to preclude the suspect from observing the search; (4) the relationship between the means used to prevent observation of the search and the reasons justifying the prevention; (5) the existence of any changes in circumstances between when consent is obtained and when the officers prevent the suspect from observing the search; and (6) the degree of pressure applied to prevent the suspect either from observing the search or voicing his objection to its proceeding further.

<u>United States v. McWeeney</u>, 454 F.3d 1030, 1037 (9th Cir. 2006).  The Government proffers the six factors discussed in <u>McWeeney</u> are not perfectly applicable in this context, however, argues

---

[16]  The Government considers this and the revocation arguments to be forfeited or waived based on Defendant's failure to raise them in the motion to suppress.  <u>See</u> <u>Crowley v. Epicept Corp.</u>, 883 F.3d 739, 748 (9th Cir. 2018) ("A 'party forfeits a right when it fails to make a timely assertion of that right and waives a right when it is intentionally relinquished or abandoned.' " (citation omitted)).  The Government proffers Defendant's motion by title of subsection C and the reasoning therein makes clear that the only argument being raised is "[Defendant's] consent to the blood draw, one hour before the draw occurred, was not valid." (Mot. at 9-10.)  The Government only addressed such arguments in case the Court feels it necessary to analyze either argument.  The Court finds it useful to consider such arguments as part of the totality of the circumstances analysis.

1 the reasoning above takes into consideration the ultimate purpose of those factors.  (Opp'n 19

2 n.12.)  Defendant did not address <u>McWeeney</u> in reply.  The Court agrees with the Government

3 that the reasoning the Court employed above as to the five factor and other relevant factor

4 totality of the circumstance analysis, given these factors are not perfectly applicable to a blood

5 draw versus an ongoing physical search, have adequately addressed the determination of

6 "whether the officers' conduct is objectively recognizable as intimidation directed mostly (or

7 exclusively) at coercing [Mr. Aguirre] into believing that [he] had no right to withdraw or delimit

8 [his] consent once it was given, and whether a reasonable person faced with the officers' conduct

9 would have believed that no such right existed."  <u>McWeeney</u>, 454 F.3d at 1037.

10        Additionally, the Government argues that considering this standard, at no point was

11 Defendant ever told he could not withdraw consent; that Ranger Cloutier's question at the

12 detention center, minutes prior to the blood draw, asking if Defendant *still* consented to the blood

13 draw, made it abundantly clear that withdrawal of consent remained an option to the very end.

14 Overall the Court agrees with the Government that the Defendant's contention that the "rangers

15 hinged the exercise of his right to an attorney and a simple drink of water on his continued

16 compliance" (Mot. 10), is verifiably inaccurate.  Again, Defendant did not address the request for

17 an attorney in the original motion beyond the quoted portion (Mot. 10), and did not address the

18 Government's arguments in reply concerning the mention of an attorney.  The Government

19 contends that as for an attorney, Ranger Cloutier only indicated that Defendant would be able to

20 talk to his attorney at the hospital to which Defendant agreed.  The Court agrees the video

21 evidence demonstrates this is reasonably true.

22        Some of the statements concerning the water, for example from the phlebotomist's, could

23 be troubling somewhat if taken in isolation, however, the totality of the video evidence show the

24 rangers did not make the provision of water contingent on consent or make it seem like

25 ///

26 ///

27 ///

28 ///

1  Defendant could not withdraw consent.[17]  The Government proffers as to the provision of water,

2  Ranger Cloutier sought water for Defendant immediately without any hesitation or conditions,

3  and likewise, Ranger Morrison's statement that "We'll have the test first, and then get you a

4  bottle of water," objectively cannot be viewed as an attempt to convey that Defendant had no

5  right to withdraw consent., and argues the statement, instead, only conveys that Ranger Morrison

6  thought it most efficient for the blood draw to be taken first.  Additionally, the Government

7  argues, even assuming *arguendo* that the phlebotomist's statement can be considered as if made

8  by one of the rangers, that comment is of limited value given Defendant's minutes prior

9  reaffirmation of consent to Ranger Cloutier and agreement to Ranger Morrison's statement.  The

10  Government argues, in context, the phlebotomist's comment, while poorly phrased, also

11  appeared designed to communicate that the whole process could be completed faster for the

12  benefit of everyone if Defendant was less belligerent (with the phlebotomist), and understood

13  properly, the comment amounted to no more than a stray remark, of little significance,

14  particularly given its stark contrast with the statements and actions of the actual officers on

15  scene.

16        The Court agrees the phlebotomist's comment in isolation could cause pause, however,

17  the Court finds significant the rangers' actions and statements overall, and most significant and

18  prominent that Ranger Cloutier *immediately* asked if water was available when the Defendant

19  requested it.  The Court finds the totality of the circumstances show consent was properly given,

20  and "the officers' conduct [was] [not] objectively recognizable as intimidation directed mostly

21  (or exclusively) at coercing [Mr. Aguirre] into believing that [he] had no right to withdraw or

22  delimit [his] consent once it was given, and whether a reasonable person faced with the officers'

23  conduct would have believed that no such right existed."  McWeeney, 454 F.3d at 1037.

24

25  [17]  As for water, in reply, Defendant does note that, in addressing certain facts presented in the initial motion, that
    the "Defense chose to portray the events at the jail as shown through Ranger Morrison's body-worn camera because

26  Ranger Morrison was in the room when Mr. Aguirre's blood was drawn, and Ranger Cloutier was not. In doing so,
    defense inadvertently missed Ranger Cloutier's conversation with Mr. Aguirre as he walked him inside.  However,

27  this interaction should not change the Court's analysis, as all of the factors applicable to the invalid consent in the
    car continued to apply at that time.  Moreover, Mr. Aguirre first replied to Ranger Cloutier's question by asking for
    water, and frustratedly answered "yes" after Ranger Cloutier asked a second time.  This interaction only adds to the

28  reasonable belief that compliance was required before a drink of water would be provided."  (Reply 4 n.3.)

1    Further, as the Government argues, Defendant's demeanor before and after the blood draw also

2    indicates that no reasonable person would view the rangers' actions as making illusive the right

3    to withdraw consent, because as noted earlier, all indications suggest that Defendant wanted a

4    blood draw, particularly given his growing conviction that the results would vindicate him.

5    Specifically, first spontaneously volunteering to take a blood test, then confirming and

6    reaffirming his consent multiple times, while further commenting that all the alcohol in his blood

7    would have dissipated by the time he would have been transported to the hospital.   The

8    reaffirmation of consent at the detention center was made while Defendant was already thirsty

9    and not made contingent on the provision of water; Defendant appeared undeterred in voicing

10   any issues or concerns he had; and finally, the laughing and smiling exhibited by Defendant at

11   times further suggests that the atmosphere created by the officers was not "highly coercive."

12   Accordingly, the Court finds Mr. Aguirre was not subject to intimidation or coercion

13   directed mostly (or exclusively) at coercing him into believing he had no right to withdraw or

14   delimit his consent once it was given, nor that a reasonable person faced with the officers'

15   conduct would have believed that no such right existed.

16                                              **IV.**

17                                  **CONCLUSION AND ORDER**

18   Based on review of all relevant evidence and the totality of the circumstances, as well as

19   consideration of all applicable legal standards and relevant factors expressed therein, the Court

20   finds the Defendant Abraham Aguirre provided consent that was unequivocal, specific, and

21   voluntary, to the blood draw test.

22   Having found consent was unequivocal, specific, and voluntary, the Court need not

23   separately address whether exigent circumstances also justified the warrantless blood draw.  See

24   Taylor, 60 F.4th at 1243 ("A warrantless search may occur when an individual gives consent that

25   is "voluntary, unequivocal, and specific.") (cleaned up); United States v. Ruiz, 428 F.3d 877, 882

26   n.2 (9th Cir. 2005) ("Because we affirm on the ground that apparent authority supported the

27   consent of Boswell to search, we need not reach the issues whether exigent circumstances

28   justified the challenged search, or whether the single purpose container exception permitted the

search."); <u>Mendez v. Cnty. of Los Angeles</u>, 897 F.3d 1067, 1075 (9th Cir. 2018) ("an officer who wants to enter a property can do so not only with a warrant but also with consent . . . [i]n normal circumstances, if an officer does not have a warrant **or** consent **or** exigent circumstances, the officer must not enter." (emphasis added)); <u>United States v. Reid</u>, 226 F.3d 1020, 1028 n.1 (9th Cir. 2000) ("Because the protective sweep was a search supported by a valid consent, I need not reach the issues whether the search was also supportable by exigent circumstances or as a protective sweep incident to an arrest." (Wardlaw, J., dissenting)); <u>Michigan v. Clifford</u>, 464 U.S. 287, 292–93, 104 S. Ct. 641, 646, 78 L. Ed. 2d 477 (1984) ("If reasonable privacy interests remain . . . the warrant requirement applies, and any official entry must be made pursuant to a warrant in the absence of consent **or** exigent circumstances." (emphasis added)).

Based on the foregoing, IT IS HEREBY ORDERED that Defendant Abraham Aguirre's motion to suppress (ECF No. 26) is DENIED.

IT IS SO ORDERED.

Dated:   **August 10, 2023**

_____
UNITED STATES MAGISTRATE JUDGE